UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXPORT DEVELOPMENT CANADA,<br><br>             Plaintiff,<br><br>v.<br><br>E.S.E. ELECTRONICS, ET AL.<br><br>           Defendants. | Case No.  CV 16-02967- BRO (RAOx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL** |

## I.

## INTRODUCTION AND PROCEDURAL HISTORY

This case stems from the agreement between Export Development Co. ("Plaintiff" or EDC") and ESE Electronics ("E.S.E.") regarding the sale of

Thrustmaster TX Ferrari 458 Italia Edition Racing Wheel (the "TX Wheel")[1], and E.S.E.'s alleged failure to pay for the TX Wheels it received. EDC filed its original Complaint in the Central District of California on April 29, 2016. (Dkt. No. 1.) On June 17, 2016, Plaintiff filed its First Amended Complaint. (Dkt. No. 18 ("FAC").) In its FAC, Plaintiff brought four causes of action against Defendants E.S.E. Electronics and E.S.E.'s chief executive officer, David Kazemi[2]: (1) Action for the price; (2) Restitution/Quasi Contract; (3) Constructive Trust; and, (4) Promissory Fraud (against Kazemi). (*See* FAC.) Defendants answered the FAC on September 1, 2016. (Dkt. No. 34). On December 12, 2016, Plaintiff sought partial summary judgment. (Dkt. No. 38 ("Summary Judgment Motion").) On February 6, 2017, the Court denied Plaintiff's Summary Judgment Motion. (Dkt. No. 57 ("Summary Judgment Order").)

On June 20, 2017, the Court having reconsidered its Summary Judgment Order, granted partial summary judgment in favor of Plaintiff with respect to 926 non-defective TX Wheels units because Defendant was liable for such units under both a contract for sale and a consignment contract theory. (*See* Dkt. No. 164 ("MSJ2 Order").) On July 14, 2017, the Court approved the parties' Final Pretrial Conference Order. (*See* Dkt. No. 186 ("PTCO").) On July 25, 2017, EDC filed its Trial Brief. (Dkt. No. 191 ("PBR").) On July 26, 2017, Defendant filed its Trial Brief. (Dkt. No. 192 ("DBR").)

On August 1 and 2, 2017, this Court presided over the bench trial in this matter. (*See* Dkt. Nos. 200, 201.)

---

[1]   TX Wheels are used to play certain video games.

[2]   On April 21, 2017, EDC dismissed without prejudice its claims against Defendant Kazemi. (*See* Dkt. No. 121.)

## II.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1332. Further, venue is proper under 28 U.S.C. § 1391.

## III.

## FINDINGS OF FACT[3]

1.    Plaintiff EDC is a Canadian Crown corporation headquartered in Ottawa, Canada. It is a non-profit government agency that insures Canadian exporters selling goods in the U.S. against non-payment.

2.    Non-party Guillemot Inc. ("Guillemot") is a merchant that designs and manufactures electronic equipment, including gaming consoles.

3.    Defendant E.S.E. is a merchant wholesaler and distributor of electronics and other items.

4.    All claims asserted in this action have been assigned to EDC by Guillemot.[4]

5.    On November 11, 2014, E.S.E. sent purchase order no. P201411049 to Guillemot for 2,800 units of TX Wheels.

6.    On November 17, 2014, E.S.E. received 200 units of the TX Wheel.

7.    E.S.E. subsequently received an additional 2,269 units of the TX Wheel from Guillemot. E.S.E. commingled the TX Wheels with additional merchandise in its warehouse.

8.    E.S.E. did not pay for 1,119 units of the TX Wheel.

9.    The agreed price for the goods was $202.49 per unit.

10.    On November 20, 2014, defendant Kazemi emailed Jonathan Tanner,

---

[3] Any finding of fact which constitutes a conclusion of law is hereby adopted as a conclusion of law.

[4] Guillemot and E.S.E. are referred to collectively as the "contracting parties."

3.

Mark Crane, and Maher Chammas of Guillemot purporting to confirm the terms of the parties' agreement.

11.     Defendant Kazemi's November 20, 2014 email stated:

> Jonathan,
>
> I just want to confirm the following as per our agreement:
> 1. my cost is $202.00 as per the email below
> 2. I will be refunded/credited the difference when you bill me for $235
> 3. Items are on consignment basis and I can return items that were not sold
>
> Please confirm.

12.     On November 28, 2014, E.S.E. started reselling the TX Wheels with its first sale of 18 units to non-party Wintec Industries, Inc. ("Wintec"). Those 18 units were sold to Wintec for $238 per unit.

13.     On December 5, 2014, E.S.E. emailed Guillemot purchase order no. P201411049 for 2,200 units of the TX Wheel.

14.     On December 8, 2014, E.S.E. sold 16 units of the TX Wheel to Wintec for $238 per unit.

15.     On December 12, 2014, E.S.E. sold 15 units of the TX Wheel to Wintec for $238 per unit.

16.     On December 16, 2014, E.S.E. sold 48 units of the TX Wheel to Wintec for $238 per unit.

17.     On January 23, 2015, Guillemot emailed E.S.E. stating that payment of invoice no. 29459 was due the next day.

18.     On January 26, 2015, E.S.E. made its first sale of 627 units of the TX Wheel to non-party Bright Light Business ("Bright Light").

19.     On February 3, 2015, Guillemot emailed E.S.E. stating "[a]ccount is past due.  Expecting full payment this week."

20.     On February 3, 2015, E.S.E. received a revised invoice no. 29459 from Guillemot stating the price for the TX Wheels was $202.49 per unit.

4.

21.     On February 10, 2015, E.S.E. sold 48 units of the TX Wheel to Wintec for $238 per unit.

22.     On February 12, 2015, E.S.E. made its first payment for the TX Wheels to Guillemot in the amount of $40,498.00.

23.     On February 20, 2015, E.S.E. made its second payment to Guillemot for the TX Wheels in the amount of $20,249.00.

24.     On February 25, 2015, E.S.E. made its third payment to Guillemot for the TX Wheels in the amount of $40,498.00.

25.     On March 4, 2015, E.S.E. sold 48 units of the TX Wheel to Wintec.

26.     On April 13, 2015, E.S.E. made its fourth payment to Guillemot for the TX Wheels in the amount of $40,498.00.

27.     On April 24, 2015, Guillemot called E.S.E. and told David Kazemi it needed the TX Wheels back from Wintec or, alternatively, E.S.E. was required to pay the full amount due.

28.     Also on April 24, 2015, Guillemot emailed E.S.E. stating it "must collect the total balance of the account without any further delay."

29.     On May 11, 2015 EDC wrote to E.S.E. demanding payment for the TX Wheels.

30.     The same day, E.S.E. made its second sale of 600 units of the TX Wheel to Bright Light for $600 per unit.

31.     On May 14, 2015, Guillemot emailed E.S.E.'s counsel of record to inquire if E.S.E. wished to resolve the dispute.

32.     The same day, E.S.E. made its fifth payment to Guillemot for the TX Wheels in the amount of $10,124.50.

33.     On May 22, 2015, Guillemot emailed E.S.E.'s counsel of record to inquire as to the status of E.S.E.'s account.

34.     On May 27, 2015, Guillemot emailed E.S.E.'s counsel of record stating "Any luck for collaboration with ESE?"

35.     The same day, E.S.E.'s counsel of record replied stating it was his "understanding is that the merchandise was shipped to ESE on consignment."

36.     Guillemot responded the same day stating "[n]o, we did not approve consignment."  Guillemot also requested information as to where the TX Wheels were, how many had been sold, and whether E.S.E. would return the unsold units.

37.     On May 29, 2015, Guillemot offered to have E.S.E. sell 1,000 units of the TX Wheel to Amazon.  E.S.E. never responded to that offer.

38.     On June 3, 2015, Guillemot again emailed E.S.E.'s counsel of record stating "$308k of past due, inventory not sold to Walmart as was promised, no response to provide reports on inventory and sell-through, no response to our suggestion to sell to Amazon and all you can say is asking: "what is it you expect to happen?"  E.S.E. declined to make any proposal to resolve its account.

39.     On June 4, 2015, E.S.E.'s counsel of record emailed Guillemot stating that the "deal was on consignment and E.S.E. continues to make payments as it sells merchandise."

40.     On June 8, 2015, Guillemot again emailed E.S.E.'s counsel of record noting that E.S.E. had not responded to Guillemot's request for information concerning E.S.E.'s inventory of the TX Wheels or Guillemot's offer to transfer 1,000 units of the TX Wheels to Amazon. E.S.E. did not respond to that email.

41.     The same day, E.S.E. sold 300 units of the TX Wheel to Wintec for $230 per unit.

42.     On June 10, 2015, E.S.E. sold another 282 units of the TX Wheel to Bright Light for $230 per unit.

43.     On June 16, 2015, E.S.E. made its sixth and seventh payments to Guillemot for the TX Wheels, each in the amount of $40,498.00 (for a total of $80,996).  Since then, E.S.E. has not made any further payments for the TX Wheels.

44.     On July 9, 2015, E.S.E. made its first request to Guillemot for a return merchandise authorization ("RMA") for 45 units of the TX Wheel.

45.     On July 13, 2015, Guillemot responded by stating "[w]ould you like an RMA for all good and defective inventory?"

46.     On around July 28, 2015, E.S.E. did an inventory report of its stock.

47.     On July 28, 2015, E.S.E. emailed Wintec stating it had 144 units of the TX Wheel and offered to sell them to Wintec.

48.     On July 30, 2015, Guillemot emailed E.S.E. stating:

> We would like to give ESE an RMA for all remaining inventory. Is that something that ESE will agree to? I know that you're waiting on an RMA for 45 units. We will provide the RMA for those defective units, but we would also like the return of all remaining stock as well.

49.     On September 3, 2015, E.S.E. sold another 61 units of the TX Wheel to Bright Light for $235 per unit.

50.     On September 21, E.S.E. requested an RMA for 200 units of the TX Wheel from Guillemot.

51.     The same day, Guillemot emailed E.S.E. stating "[w]e would like to give E.S.E. RMA [sic.] for all remaining inventory (defective and unsold). Is that something that E.S.E. will agree to?" E.S.E. did not respond to this offer.

52.     Guillemot repeated its offer to take back all defective and unsold inventory from E.S.E. on September 25, September 29, and October 22, 2015. E.S.E. did not respond to any of those offers.

53.     On November 10, 2016, E.S.E. assigned all rights to any claims it has against Bright Light to its credit insurer, Euler Hermes ("Euler").

54.     The next day, Euler paid E.S.E. $337,667.10. This insurance payment was not for the TX Wheels E.S.E. sold to Bright Light, but for different products that E.S.E. did not receive from Guillemot.

55.     E.S.E.'s initially responsed to EDC's interrogatories no. 11 and 12 by interposing a relevancy objection to the question of whether and how much E.S.E. was paid by its customers for the TX Wheels.

56.     E.S.E. resold all the TX Wheels to Wintec and Bright Light.

57.    E.S.E. presently has 193 units of the TX Wheel in its possession, which it claims are defective.

58.    E.S.E. first learned some of the TX Wheels were allegedly defective in late February 2015.

59.    E.S.E. does not know what defects, if any, exist in the 193 allegedly defective units in its possession.

60.    E.S.E. has never notified Guillemot what defects, if any, exist in the 193 allegedly defective units in its possession.

61.    David Kazemi's November 20, 2014 email purporting to confirm the terms of the parties' agreement did not include any terms concerning attorneys' fees or default interest.

62.    The purchase orders E.S.E. submitted to Guillemot did not include any terms concerning attorneys' fees or default interest.

63.    The purchase orders E.S.E. submitted to Guillemot did not not expressly limit any sale on the acceptance of the terms on E.S.E.'s purchase orders.

64.    Guillemot had no control over the price at which E.S.E. resold the TX Wheels and E.S.E. was free to resell them for any price it wanted without Guillemot's prior consent.

65.    Guillemot had no control over to whom E.S.E. resold the TX Wheels.

66.    The parties did not agree that E.S.E. would receive a commission for its sales of the TX Wheels and E.S.E. was to retain the profits from its sales.

67.  Exhibits 13 and 15, the invoices E.S.E. received from Guillemot, all included identical attorneys' fee and default interest provisions at the bottom.

68.    On November 21, 2014, E.S.E. received an invoice from Guillemot that included the interest and attorneys' fee provisions.

69.    On November 26, 2014, E.S.E. received an invoice from Guillemot that included the interest and attorneys' fee provisions.

70.     E.S.E. never objected to the interest or attorneys' fee provisions on any invoices it received from Guillemot.

71.     E.S.E. did not sell any TX Wheels directly to Walmart.

72.     On March 11, 2015, Guillemot wrote to David Kazemi asking how many units of the TX Wheel Walmart had at that time.

73.     On March 23, 2015, Guillemot again wrote to David Kazemi asking how many units of the TX Wheel Walmart had at that time.

74.     Dan Barona of EDC did not contact E.S.E. on behalf of EDC in relation to the debt at issue before this action was filed.

At trial in this matter, Plaintiff requested the Court take notice of certain admissions of party opponent, E.S.E.  E.S.E. did not object to the Court's notice of such admissions.  Accordingly, the Court hereby finds the following facts.

75.     The Court received Kazemi's following deposition testimony, (Kazemi Dep. Vol. 2 at 459:10–12), as an admission by E.S.E.:

Q.     Was Guillemot entitled to recall the goods from E.S.E.?

A.     No.

76.     The Court received Kazemi's following deposition testimony, (Kazemi Dep. Vol. 2 at 452:3–23), as an admission by E.S.E.:

    Q     Okay.· And does that mean that when those units that were
    supposedly on consignment left E.S.E.'s warehouse, at that point
    E.S.E. was supposed to pay Guillemot?
    A     [Kazemi:] See, we didn't declare -- we didn't clear that·one
    if I'm paying the guys net 60.· Some occasion I paid Guillemot before
    even I get paid.· Some occasion I was waiting for the payment.· You
    know, I was managing the ability of that.· But E.S.E. intention was
    no matter what -- I'm not going to go repeat this one again.· No
    matter what, E.S.E. was obligated to pay Guillemot.
    Q     Okay.
    A     If anybody pay or not to pay.· We're going back –
    Q     No.· You mean if any of E.S.E.'s customers pay?
    A     Anybody.
    Q     Right.
    A     No matter if the merchandise get robbed by my warehouse.
    Q     Yeah.
    A     Any liability, I took over that.

77.   The Court received Kazemi's following deposition testimony as an admission by E.S.E., (Kazemi Dep. Vol. 1 at 111:17–24):

> Q      Okay.· Let's look at the pictures. ·Let me -- answer my question though.· Should those stickers or pictures of those stickers have been produced to EDC?
> A      Probably yes.
> Q      They are relevant, are they?
> A      They're relevant, yeah, what is wrong with the unit.

78.   The Court received Kazemi's following deposition testimony, (Kazemi Dep. Vol. 2 at 584:11–585:2), as an admission by E.S.E.:

> Q      Ask me if you don't understand this:· Did you·ever believe Guillemot was unable to perform any part of·the deal relating to the TX Wheels?· Like, did you think, for example, that Guillemot is not able to ship the·Wheels that I need or Guillemot is not able to -- so·Guillemot's obligations in this transaction, for example,·were to ship the Wheels?· Or according to you -- to you. ·Or according to you, their obligation was to give a 10 percent rebate?· Did you ever say to yourself "Oh, Guillemot is insolvent.· They can't afford to pay the 10 percent rebate.· They can't perform this deal"?  I'm just giving you examples that you might or might not say. ·Was there any part of that transaction that you ·believed Guillemot was not able to uphold what it was supposed to do?
>
> A      No.

79.   The Court received Myra Urmeneta's following deposition testimony, (Urmeneta Dep. 189:5–18), as an admission by E.S.E.:

> Q      Payment to Guillemot was due when E.S.E.·shipped the TX Wheels to E.S.E.'s customer, and·E.S.E.'s customer received them; is that right?
> A      Yes.
> Q      Not when E.S.E.'s customer paid E.S.E.?
> A      Yes.
> Q      So if E.S.E. shipped 1,000 units to Bright Light, and Bright Light received the thousand units, is it correct that E.S.E. then owed Guillemot for $1,000 units?
> A      Yes.
> Q      And it didn't matter whether or not Bright Light paid E.S.E.?
> A      Yes.

80.   The Court received Myra Urmeneta's following deposition testimony, (Urmeneta Dep. 193:24–194:4), as an admission by E.S.E.:

10.

> Q  Okay. So this language·saying that the client will be liable for all expenses and 1.5 percent monthly interest, you mean·there was no reason to object to that because there·was no dispute at that time?
> A  Yes.

Pursuant to Federal Rule of Civil Procedure 52, the Court makes the following additional findings of fact.

81.  Guillemot and EDC executed an assignment agreement, pursuant to which Guillemot assigned its claims against E.S.E. to EDC.

82.  David Kazemi is the chief executive officer and sole owner of Defendant E.S.E. Electronics, Inc.

83.  Kazemi is proficient in, and can read and understand the English language. He can and does read books in English.

84.  E.S.E. resold 1,570 units of the TX Wheel to Bright Light. E.S.E. issued four invoices to Bright Light for those particular units. (*See* Tr. Ex. 61.) Bright Light paid E.S.E. in full for the 1,570 units of the TX Wheel that E.S.E. shipped to Bright Light. (*See also* Tr. Ex. 61.)

85.  After ESE received the 200 TX Wheels on November 12, 2014, Kazemi told Crane and Tanner that ESE would only accept more TX Wheels on consignment. Crane acknowledged that Kazemi told him that additional TX Wheels had to be received on consignment. However, Crane explained to Kazemi that Guillemot, rather than Crane, would need to approve for consignment and that Guillemot never approved the request.

86.  On November 21, 2014, Tanner replied to Kazemi's November 20, 2014 email stating, "David [Kazemi], [w]e are putting together a spreadsheet that will detail everything. Stay tuned." (Tr. Ex. 5.)

87.  Guillemot's distributor, Petra Industries, shipped the 2,269 TX Wheels units to E.S.E. on November 19 and 20, 2014. (*See* Tr. Ex. 91 ("Bills of Lading")). At times relevant to this Action, Petra Industries was located at 5201 W Reno Ave #F, Oklahoma City, OK 73127. (*See id.*)

1    88.    E.S.E. received an invoice from Guillemot for 2,269 of the 2,469 TX

2    Wheel units delivered to E.S.E. on November 21, 2014. (*See* Tr. Ex. 15-1.)  Exhibit

3    15-1 reflects a payment due date of January 24, 2015.  (*Id.*)

4    89.    The following language is printed at the bottom of Guillemot's invoices,

5    (Tr. Ex. 15 (collectively, the "Invoices")), to E.S.E.:

> The client will be LIABLE for all expenses incurred to recover the
> payment of said amount including all legal fees.  These presents shall
> be governed and interpreted by the law in force in the province of
> QUEBEC.  If any provision hereof is determined to be void or
> unenforceable in a whole or in part, it shall be deemed not to affect or
> impair any other provision hereof.  See terms of sale on reverse side.
> All merchandise remains GUILLEMOT INC. property until paid for
> in full.  No returns without our written consent.  ***Past due accounts:***
> ***1.5% Monthly INTEREST***.

11    90.    At times relevant to this Action, Kazemi maintained a schedule of

12    payments to Guillemot.  (*See* Tr. Ex. 62 ("Schedule of Payments").)  This internal

13    E.S.E. spreadsheet reflects invoice and payment due dates for E.S.E.'s transaction

14    with Guillemot.  (*See id.*)  Exhibit 62 pertains to the TX Wheel transactions with

15    Guillemot.  Exhibit 62 reflects a due date of January 24, 2015 for each of E.S.E.'s

16    payments to Guillemot.  (*See id.*)  Exhibit 62 also reflects that the underlying Invoice

17    had aged 144 days at the time the particular Schedule of Payments was memorialized

18    for trial.  (*See id.*)

19    91.    Kazemi's recordkeeping (in the form of schedules of payments) differed

20    for consignment contracts versus contracts-for-sale.  When E.S.E. entered into

21    consignment agreements, Kazemi would log the customer number in the "aging"

22    column, whereas when E.S.E. bought goods outright, Kazemi would enter the actual

23    aging date of the invoice in the "aging" column.

24    92.    Kazemi inquired regarding a further order of TX Wheels on February 12,

25    2015.  (*See* Tr. Ex. 83.)

26    93.    Kazemi's November 20, 2014 email to Tanner is the only documentary

27    evidence Kazemi has supporting his claim that the TX Wheels transaction was on

28    consignment, rather than an outright sale of goods.

# IV.

# CREDIBILITY DETERMINATIONS

94.     Ninth Circuit Model Jury Instruction 1.11 provides guidance to jurors when assessing credibility.  The factors include:  (1)  the opportunity and ability of the witness to see or hear or know the things testified to;  (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case and any bias or prejudice; (5) whether other evidence contradicted the witness's testimony; (6) the reasonableness of the witness's testimony in light of all the evidence; and, (7) any other factors that bear on believability.  Ninth Cir. Model Jury Instr. 1.11 (Civil) (2007).  The Court finds these factors helpful in assessing the credibility of the witnesses.  The Court has assessed these factors when determing a witness or party's credibility.

95. The Court finds David Kazemi's testimony regarding central factual issues to be *not credible*.  At trial, Kazemi admitted to no fewer than three instances[5] when he made false statements on issues of critical importance during his prior depositions and in his January 9, 2017 declaration.  Kazemi's explanation for his inaccurate or false statements is not credible.  During direct examination, Kazemi claimed that he failed to look closely at the invoices underlying his transaction with Bright Light and Guillemot, respectively.  Kazemi also testified that he failed to pay attention to the accuracy and correctness of his assertions in his January 9, 2017 declaration.  (Tr. Ex. 56.)  But significant evidence contradicts Kazemi's trial testimony.  Most notably, Kazemi's did not volunteer that he made inaccurate or false statements in his declaration or at his deposition.  Rather, as evidenced by Kazemi's trial testimony, Kazemi only retracted his prior statements when Plaintiff's counsel confronted

---

[5] Kazemi admitted his interrogatory response No. 19, Ex. 46-2, was untrue.  Kazemi admitted that his Declaration in opposition to Plaintiff's summary judgment contained untrue statements, Ex. 56.  Kazemi admitted that the handwritten changes to Day 3 deposition testimony was not true.  Kazemi admitted that his statement in Ex. 93-2 ¶ 3 was not true.

Kazemi at the second and third deposition days with countervailing evidence in form of Bright Light receipts stamped paid, and Euler Hermes insurance documents evidencing that Euler's insurance payment to E.S.E. was for goods other than TX Wheels.

96.  Furthermore, even assuming that Kazemi did not pay attention when he initially signed his declaration, Kazemi's explanation for its inaccuracy is not credible. Kazemi had multiple opportunities to review and correct his inaccurate statements. For instance, Plaintiff's counsel, David Mannion, presented Kazemi with his January 9, 2017 declaration at Kazemi's deposition on March 16, 2017.  Kazemi testified at trial that he, in fact, read from his January 9, 2017 declaration *during* his deposition. Yet Kazemi still failed to correct misstatements in the declaration.  Kazemi also testified at trial that he knew on Day 1 of his deposition that he had "messed [the declaration's assertions] up"; nevertheless, Kazemi failed to correct his prior misstatements at that time.  Kazemi's inaccurate/false testimony pertains to this litigation's *central* issues.  Kazemi's extensive contradictory statements and the pattern and timing of Kazemi's retraction of prior, admittedly false testimony renders Kazemi's explanation for the inaccurate deposition testimony not credible.

97.  The Court observed Kazemi's demeanor while testifying regarding the attorneys' fees/interest provisions in particular.  When Plaintiff's counsel, David Mannion, asked Kazemi to read portions of the Euler Hermes insurance documents (Tr. Ex. 71-1), bearing small, blurry text, Kazemi demonstrated little difficulty deciphering and reading aloud the particular text.  However, when asked to read small, sharp text pertaining to attorneys' fees and interest on the Invoices, Kazemi shifted around in his seat, adjusted and readjusted his reading glasses on the bridge of his nose, and testified that he could not read a single word of the provision at issue. Kazemi's change in demeanor, and exaggerated facial- and body expression when asked to read the attorneys' fees and interest provision as compared to his demeanor and expressions when reading blurrier, similarly small text in Trial Exhibit 71-1 leads

14.

the Court to conclude that Kazemi's purported inability to decipher or read the attorneys' fees/interest provision on the Guillemot Invoices is not credible. In addition, Kazemi is the sole owner of E.S.E. Thus, Kazemi has a significant, personal interest in the outcome of this litigation.

98. In the Ninth Circuit, a factfinder may choose to believe "everything a witness says, or part of it, or none of it." Ninth Cir. Model Jury Instr. 1.14 (Civil) (2007, updated July 2017). Based upon Kazemi's repeated, admittedly false testimony pertaining to central issues (notably, each false statement supports E.S.E.'s purported defenses to liability) during his depositions and in his declaration, Kazemi's personal interest in the outcome of this Action, and Kazemi's demeanor on the witness stand, the Court finds only very limited portions of Kazemi's testimony throughout this litigation credible.

99. The Court finds the testimony of Jonathan Tanner and Maher Chammas to be *credible*. The Court observed their demeanor and found them to be forthright, credible witnesses. Each of these witnesses testified in a straightforward manner and no evidence or testimony was adduced at trial that would indicate that either of these witnesses personally stood to gain from the Action's outcome. Their testimony was largely uncontradicted by past statements and corroborated by documentary evidence. Accordingly, the Court deems their testimony to be credible.

100. With respect to Mark Crane and Myra Urmaneta[6], the Court finds their testimony to be *credible*. The Court observed the demeanor of the witnesses, and found them to be believable. In addition, their testimony is consistent with the documents and with each other. The witnesses responded to questions in a

---

[6] Ms. Urmaneta's testimony on the second day where she testified inconsistently with her testimony on the first day regarding why she did not respond to Guillermot's emails was adequately clarified. Accordingly, the Court believes Ms. Umaneta's testimony that the reason she did respond to Guillermot's emails is because it slipped her mind.

straightforward and forthright manner.  They presented as unbiased witnesses who simply answered the questions.  Accordingly, the Court believes their testimony.

## III.

## CONCLUSIONS OF LAW

101.  "In bench trials, Fed.R.Civ.P. 52(a) requires a court to 'find the facts specially and state separately its conclusions of law thereon.' " *Vance v. American Hawaii Cruises, Inc.,* 789 F.2d 790, 792 (9th Cir.1986) (quoting Fed. R. Civ. P. 52(a)). "One purpose behind Rule 52(a) is to aid the appellate court's understanding of the basis of the trial court's decision. This purpose is achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate conclusions." *Id.* (citations omitted). Furthermore, the court "is not required to base its findings on each and every fact presented at trial." *Id.* at 792; *see generally Kurth v. Hartford Life & Acc. Ins. Co.*, 845 F. Supp. 2d 1087, 1091 (C.D. Cal. 2012).  In a bench trial, the court may enter judgment against a party on a claim that, under the controlling law, can be maintained only with a favorable finding on that issue. Fed. R. Civ. P. 52(c).  Under Rule 52(c), the court has express authority to resolve disputed issues of fact. *Ritchie v. United States,* 451 F.3d 1019, 1023 (9th Cir. 2006).  The Court may make findings in accordance with its own view of the evidence and is not required to draw any inferences in favor of the non-moving party. *Id.*  Pursuant to Rule 52, the Court makes the following conclusions of law.

### A. Interpretation of Contracts

102.  Under California law,[7] a contract is to be interpreted so as "to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ.

---

[7] Under California choice-of-law rules, California state law applies, unless the parties object. *See, e.g., Hurtado v. Superior Court*, 11 Cal. 3d 574, 580 (Cal. 1974). Here, Defendant belatedly raised, and subsequently withdrew, its intent to invoke Québec law. (*See* PTCO Motion at 12; PTCO Reply at 5.)  As the Court explained in its Summary Judgment Order, absent timely objection by the parties, the Court applies California law. (*See* Summary Judgment Order at 7 n.3)

Code § 1636; *see Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 955 (Cal. Ct. App. 2003). The mutual intent of the parties is to be determined from the language of a contract, "if the language is clear and explicit, and does not involve an absurdity." *See id.* § 1638. "It is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation." *Titan Group, Inc. v. Sonoma Valley Cty. Sanitation Dist.*, 164 Cal. App. 3d 1122, 1127 (Cal. Ct. App. 1985). A party's subjective and undisclosed intent is simply irrelevant to contract interpretation. *Newport Beach Country Club*, 109 Cal. App. 4th at 956.

103. When discerning the parties' mutual intent, a court must take care not to substitute one party's view of what the contract should have said for the terms that are actually contained within the document. *See Ben-Zvi v. Edmar Co.*, 40 Cal. App. 4th 468, 473 (Cal. Ct. App. 1995). In other words, "the courts do not make contracts for the parties." 5 Margaret N. Kniffin, Corbin On Contracts § 24.19 (rev. ed. 1998); *see also Bookstein v. Bookstein*, 7 Cal. App. 3d 219, 223 (Cal. Ct. App. 1970) ("It is not the province of a court to add the provisions of a stipulation, to insert a term not found therein, or to make a new stipulation for the parties.").

104. But where the parties disagree about the meaning of the contract, a court must construe it applying a two-step approach. *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (2004). First, the court must determine as a matter of law whether the contract is ambiguous. *Id.* In making this determination, the court considers whether the contract's language is reasonably susceptible to the interpretation urged by a party, and may properly consider any extrinsic evidence that would be relevant to this end. *See id.* If an ambiguity exists, the court moves to the second step in the analysis, and admits any extrinsic or parol evidence to assist in interpreting the contract. *Id.*; *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010) ("Parol evidence is properly admitted to construe a contract only when its language is ambiguous."). If the parties do not present any parol evidence, or if the parol evidence is not in conflict,

17.

the court may resolve any ambiguities as a matter of law. *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (Cal. App. Ct. 2008), *as modified on denial of reh'g* (June 4, 2008). If there is a conflict in the extrinsic evidence, then the factfinder must resolve the factual conflict. *See City of Hope Nat. Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (Cal. 2008); *Wolf*, 114 Cal. App. 4th at 1351.

105. Here, the parties disagree about the contract's meaning; accordingly the Court proceeds by *Wolf*'s two-step approach. The documentary evidence of the contracting parties' agreement is incomplete and disjointed; the parties engaged in undocumented oral negotiations, Kazemi sent an email requesting confirmation on November 20, 2014, Guillemot sent Invoices bearing certain terms, and the contracting parties exchanged numerous other emails. No single document can reasonably be considered as the single, final manifestation of the contracting parties' agreement, and the collection of incomplete documents lends itself to multiple interpretations. Because the documentary manifestation of the contracting parties' agreement lends itself to multiple reasonable interpretations, the Court finds that admitting parol evidence to aid in the interpretation of the parties' mutual intent in contracting is necessary and appropriate in this instance.

## B. Consignment Contract vs. Contract-for-Sale

106. The parties dispute whether their agreement pertaining to the TX Wheels was one for consignment or sale. (Compare PBR at 1–5 with DBR at 3–4.) Whether the parties agreed to a consignment is determined under the law of the state where the transaction occurred. *Kemp-Booth Co., Ltd., v. Calvin*, 84 F.2d 377, 380 (9th Cir. 1936). Under California law, "[a] consignment sale is one in which the merchant takes possession of goods and holds them for sale with the obligation to pay the owner for the goods from the proceeds of a sale by the merchant." *Bank of Cal. v. Thorton-Blue Pacific, Inc.*, 53 Cal. App. 4th 841, 847 (Cal. Ct. App. 1960). A consignment of goods for the purpose of sale ordinarily constitutes a bailment. *N. Ctys. Bank v. Earl*

18.

*Himovitz & Sons Livestock Co.*, 216 Cal. App. 2d 849, 859 (Cal. Ct. App. 1963) (citing *Perera v. Panama-Pacific Int. Exp. Co.*, 179 Cal. 63, 64 (Cal. 1918); 7 Cal. Jur. 2d, Bailments, sec. 4; 8 Am. Jur. 2d Bailments, sec. 34; 8 C.J.S. Bailments § 3; 4 Williston on Contracts (rev. ed.) sec. 1035).

107.  If, however, the transacting parties intend passage of title, the transaction may be regarded as a contract of sale rather than a bailment.  In determining which event occurred, bailment or contract of sale, the intent of the parties is controlling. *Himovitz*, 216 Cal. App. 2d at 859 (citing 8 Am. Jur. 2d, Bailments, sec. 35; 8 C.J.S. Bailments § 3.)  The bailor may sell or otherwise transfer the subject matter of the bailment and confer on the transferee an immediate and valid title without the necessity of formal delivery. *Id.* (citing 8 Am. Jur. 2d, Bailments, sec. 84; 8 C.J.S. Bailments § 32).

108.  The entire contract as well as the action of the parties thereunder must be considered to determine whether a contract was for a sale or consignment. *Consol. Accessories Corp. v. Franchise Tax Bd.*, 161 Cal. App. 3d 1036, 1040–41 (Cal. Ct. App. 1984).  Significant factors include (1) suggestion and contemplation of consignment in the memorandum of the agreement between the parties; (2) lack of obligation on the part of the "consignee" to pay for unsold goods; (3) obligation of the consignee to pay for goods when sold by him; (4) prompt remittance to consignor for goods sold, whether for cash or credit; (5) visits to consignee to inquire into sales and urge prompt remittance of collections to consignor; (6) keeping by a representative of the consignor of an account or inventory of goods consigned and sold; and, (7) provision for return of merchandise upon termination of the agreement. *Id.* (citing *Hervey v. AMF Beaird, Inc.* 464 S.W.2d 557, 562 (Ark. 1971)).

109.  A consignment agreement may also take the form of a *security* consignment, which is a contract for sale, rather than a *true* consignment. *See In re Ide Jewelry Co., Inc.*, 75 B.R. 969, 973 (Bankr. S.D.N.Y. 1987) ("[W]here a consignment is intended as security and the goods are delivered to the consignee

19.

primarily for resale, the transaction will actually be a sale or return[.]");*Martini E Ricci Iamino S.P.A.—Consortile Societa Agricola v. Trinity Fruit Sales Co., Inc.*, 30 F. Supp. 3d 954 (E.D. Cal. 2014) ("[T]he Ninth Circuit has cited with approval *In re Ide Jewelry's* discussion of, and distinction between, 'true consignments' and 'security interests.'").  In *Martini*, district court in this Circuit explained that a consignment "is nothing more than a bailment for care or sale, wherein there is no obligation of purchase in the consignee." 30 F. Supp. 3d at 966 (quoting *In re D.I.A. Sales Corp.*, 339 F.2d 175, 178 (6th Cir. 1964)).  "A true consignment creates an agency pursuant to which goods are delivered to a dealer for the purpose of resale; the consignor usually requires the consignee to charge a certain price for the goods." *Id.* (quoting *Glenshaw Glass Co. v. Ontario Grape Growers' Mktg. Bd.*, 67 F.3d 470, 475 (3d Cir. 1995)).

110.  A key distinction between a security consignment agreement and a true consignment agreement is whether the consignor (i.e. Guillemot) retains title over the underlying goods, or instead retains merely a security interest in the underlying goods. As set forth in *In re Ide Jewelry Co., Inc.*, 75 B.R. 969, 978 (Bankr. S.D.N.Y. 1987),[8] "[f]acts which support the notion that a consignment was intended as security include: (i) setting of price by the consignee, (ii) billing consignee upon shipment, (iii) commingling of proceeds and failure to keep proper accounts by the consignee, (iv) mixing consigned goods with goods owned, and (v) consignor purporting to retain title to goods until paid[.]" *Ide Jewelry*, 75 B.R. at 978.  By contrast, in a true consignment, "[t]he consignor, as principal retains the ownership, may recall the goods, and sets the sale price." *Consol. Accessories Corp. v. Franchise Tax Bd.*, 161 Cal. App. 3d 1036, 1040 (Cal. Ct. App. 1984).  "The consignee (agent) receives a commission and not the profits of the sale." *Id.*

---

[8] *Martini E Ricci Iamino S.P.A.– Consortile Societa Agricola v. Trinity Fruit Sales Co.*, Inc., 30 F. Supp. 3d 954, 966, n.8 (E.D. Cal. 2014) ("[T]he Ninth Circuit has cited with approval *In re Ide Jewelry*'s discussion of, and distinction between, 'true consignments' and 'security interests.'").

111. Here, the Court concludes that the parties intended to (and did) form a contract for sale. In reaching this conclusion, the Court evaluates the abovementioned factors to ascertain the parties mutual intent. First, with respect to suggestion and contemplation of consignment, Kazemi mentioned a consignment in his November 20, 2014 email to Guillemot. Kazemi also noted that he wished to be able to return any unsold goods. But Crane and Tanner credibly testified that, although Kazemi had raised consignment in preliminary negotiations, neither Crane nor Tanner agreed to a deal of that structure. Crane credibly testified that he advised Kazemi that Crane was not authorized to agree to consignment deals on Guillemot's behalf. Notably, Kazemi's November 20, 2014 email ends with a request that Guillmot "please confirm" the terms he had suggested in the email. No evidence before the Court shows that Guillemot ever confirmed Kazemi's November 20, 2014 email terms. Furthermore, Kazemi sent the email, the only documentary indication of any intent for consignment, at 4:24 p.m. PST,[9] after Guillemot's distributor, Petra Industries, had already shipped the Goods at issue to E.S.E.; the Bills of Lading reflect signatures dated November 19 and 20, 2014. (*See* Bills of Lading.) Maher Chammas credibly testified on cross examination that in his experience in this industry, the truck driver signs a bill of lading at the time the driver actually picks up the goods and leaves the warehouse.

112. The extrinsic evidence adduced at trial shows that E.S.E. received invoices bearing a payment due date of January 24, 2015. (*See* Tr. Ex. 15.) In deposition, Kazemi explained E.S.E.'s record-keeping for contracts for sale versus for consignment. (*See also* Tr. Ex. 62.)Notably, E.S.E.'s record-keeping differed based upon a given contract's nature as one for consignment or one for sale. At the time of contracting, Kazemi kept the Schedule of Payments for the Guillemot TX Wheels

---

[9] Chammas credibly explained that the Petra facility, which is located in Oklahoma), would have already been closed by 4:24 p.m. PST (i.e. 6:24 p.m. CST).

transactions according to the manner he developed for contracts for sale. In particular, the "Aging" column reflects an entry of "144 days." (*See id*.; *see also* Tr. Ex. 62.) Kazemi's Schedule of Payments to Guillemot does not reflect Kazemi's self-described, usual manner of recordkeeping for consignment contracts. These facts weigh in favor of the parties' mutual intent to contract for sale of goods.

113. Like Guillemot's Invoices, E.S.E.'s Schedule of Payments also reflects a payment due date of January 24, 2015 for the TX Wheels. (*Compare* Tr. Ex. 62 *with* Tr. Ex. 15.) The fact that Kazemi noted a particular due date for payment owed to Guillemot corroborates Kazemi's intent to form a contract for sale because it demonstrates that Kazemi did not necessarily pay Guillemot only when E.S.E. had sold TX Wheels to a third party. And the pattern of E.S.E.'s initial payments demonstrates that E.S.E. did not pay only when it had resold TX Wheels. Instead, as Kazemi testified at trial, E.S.E. began paying Guillemot in amounts exceeding the value of TX Wheels actually sold to any third party. The fact that E.S.E. paid for

units before it actually resold the units to a third party corroborates the contracting parties' mutual intent to form a contract for sale, rather than a consignment contract. E.S.E.'s recordkeeping and initial payments weigh in favor of the parties' intent to contract for a sale of goods, rather than a true consignment of goods.[10]

### C. Action for the Price

114. An action for the price, is codified at California Commercial Code[11] Sections 2709(1) and 2607(1). A seller must satisfy four elements to prove a claim under Uniform Commercial Code Section 2-709 for trade contract price (adopted by California as Commercial Code Section 2709): "(1) the acceptance of the goods by the buyer, (2) the price of the goods accepted, (3) the past due date of the price, and (4) the failure of the buyer to pay." *Zhongshan Hengfu Furniture Co., Ltd. v. Home Accents All., Inc.*, No. ED-CV-14-00038-VAP-DTBX, 2014 WL 12561625, at *4 (C.D. Cal. Oct. 20, 2014).

---

[10] Furthermore, even assuming the Guillemot and E.S.E.'s intended to form a consignment agreement, the transaction bears more markers of a security consignment rather than of a true consignment. Kazemi testified that E.S.E. did not keep accounting records of its income from selling TX Wheels. And according to Kazemi, the TX Wheels at issue were warehoused together with other goods, such that Kazemi would not be able to indicate which TX Wheels were on consignment versus bought in an outright sale. Guillemot sent the TX Wheels Invoices to E.S.E. shortly after shipping the TX Wheels to E.S.E. (*See* Invoices.) Guillemot did not control the price at which E.S.E. resold the TX Wheels, nor to whom E.S.E. resold the TX Wheels. And the parties did not agree that E.S.E. would receive a commission for its sales of the TX Wheels; rather, E.S.E. was to retain the profits from its resales. In sum, the Court concludes that the parol evidence of the parties' negotiations prior to shipment, as well as the parol evidence demonstrating E.S.E.'s and Guillemot's respective understanding of their obligations at the time of contracting evince the contracting parties' mutual intent to form a contract for sale, rather than one for true consignment of goods. Accordingly, the California Commercial Code applies to the contracting parties' agreement.

[11] California courts "generally afford great deference to the decisions of [their] sister jurisdictions interpreting [the Uniform Commercial Code's] provisions. *Oswald Mach. & Equip., Inc. v. Yip*, 10 Cal. App. 4th 1238, 1247 (Cal. Ct. App. 1992), *reh'g denied and opinion modified* (Dec. 4, 1992); *Needle v. Lasco Industries, Inc.*, 10 Cal. App. 3d 1105, 1108 (Cal. Ct. App. 1970) ("Since one of the purposes of the Commercial Code is to 'make uniform the law among the various jurisdictions' . . . the cited cases are compelling authority which we accept.").

115. Plaintiff met its burden to show, through the evidence and testimony that between November 17, 2014 and November 24, 2014, E.S.E. received a total of 2,469 units of the Thrustmaster TX Ferrari 458 Italia Edition Racing Wheel' from Guillemot. E.S.E. resold those TX Wheels to Wintec and Bright Light. E.S.E.'s receipt of the TX Wheels (absent seasonable return), and resale of those TX Wheels to third parties establishes that E.S.E.'s accepted the TX Wheels at issue.

116. The parties admit that the price per unit was $202.49. Plaintiff met its burden of establishing the price of the goods accepted.

117. Guillemot's Invoices, (Tr. Ex. 15), Mr. Chammas's credible trial testimony, and E.S.E.'s Schedule of Payments, (Tr. Ex. 62), documenting the transaction between Guillemot and E.S.E. reflect that E.S.E.'s payments to Guillemot for the TX Wheels were due over two years ago, on January 24, 2015. EDC met its burden of establishing by a preponderance of the evidence the past due date of the price.

118. As the Court found above, E.S.E. admits it has not paid for 1,119 units of the Goods. EDC met its burden of showing, by a preponderance of the evidence, that E.S.E. failed to pay for the 1, 119 TX Wheels at issue.

**D.    Interest and Attorneys' Fees Provisions**

    **1.    Whether Parol Evidence Exists to Support the Propostion that Guillemot's Invoices Were Intended as a Confirmation of the Contracting Parties' Agreement**

119. "The prevailing rule is that an invoice, standing alone, is not a contract, and a buyer is ordinarily not bound by statements thereon which are not a part of the original agreement." *Starbucks Corp. v. Amcor Packaging Distrib., a corp.*, No. CV 2:13-1754 WBS CKD, 2016 WL 3543371, at *6 (E.D. Cal. June 24, 2016) (quoting *Hebberd-Kulow Enters., Inc. v. Kelomar, Inc.*, 218 Cal. App. 4th 272, 279 (Cal. Ct. App. 2013)) (citation omitted). However, where parol evidence exists to support the proposition that an invoice was intended as a confirmation of the parties' agreement,

an invoice may state agreed-upon terms. *Hebberd-Kulow*, 218 Cal. App. 4th at 283 ("[T]o find the interest provision an agreed upon term under section 2207, the court had to rely on more evidence than the invoices.").

120. Here, parol evidence supports the proposition that Guillemot's Invoice(s) were intended as a confirmation of the contracting parties agreement. Specifically, both parties introduced evidence regarding Kazemi's November 20, 2014 email to Guillemot, requesting confirmation of the contracting parties' agreement. On November 24, 2014, Tanner replied to Kazemi's November 20, 2014 email stating, "David [Kazemi], [w]e are putting together a spreadsheet that will detail everything. Stay tuned." (Tr. Ex. 5.) In light of the contracting parties' contemplation of a confirmation of their oral negotiations, the Court concludes that the Invoices at issue may state agreed-upon terms. *Hebberd-Kulow*, 218 Cal. App. 4th at 283.

## 2. Whether the Interest and Attorneys' Fees Provision Was Incorporated Into the Contracting Parties' Agreement

121. The parties dispute whether the interest and attorneys' fees provison in particular was incorporated into the contracting parties agreement, because Kazemi's November 20, 2014 email did not mention attorneys' fees or interest. Incorporation of additional terms during contract-for-sale negotiation is governed by California Commercial Code Section 2207. *See Channell Com. Corp. v. Wilmington Mach. Inc.*, No. ED-CV-14-2240-DMG-DTBx, 2016 WL 7638180, at *5 (C.D. Cal. June 17, 2016) (quoting *Idaho Power Co. v. Westinghouse Elec. Corp.*, 596 F.2d 924, 926 (9th Cir. 1979)) ("Section 2-207 rejects the common law's 'mirror-image' rule for transactions, by 'convert[ing] a common law counteroffer into an acceptance even though it states additional or different terms.'").

122. "One intended application of section 2-207 is to commercial transactions in which the parties exchange printed purchase order and acknowledgment forms." *Channell*, 2016 WL 7638180, at *5 (quoting *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1442–43 (9th Cir. 1986) (finding that section 2-207

25.

applied to a case in which the parties exchanged purchase order and acknowledgment forms that contained different or additional terms)).  "The drafters of the U.C.C. recognized that 'because the purchase order and acknowledgement forms are oriented to the thinking of the respective drafting parties, the terms contained in them often do not correspond.'"  *Id.* (quoting *Diamond Fruit Growers*, 794 F.2d at 1442–43; U.C.C. § 2-207, Cmt. 1.4).

123.  California Commercial Code § 2207 "is [also] intended to deal with" the situation "where an agreement has been reached either orally or by informal correspondence . . . and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed."  Cal. Com. Code § 2207, Off. Cmt. 1.  "Under [California Commercial Code] § 2207(1), an acceptance will operate to create a contract even if additional or different terms are stated *unless* the acceptance is expressly conditioned on assent to the new terms.  If a contract is created under § 2207(1), then § 2207(2) defines the terms of the contract."  *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 787 (9th Cir. 2001) (citing *Steiner v. Mobil Oil Corp.*, 20 Cal. 3d 90, 101 (Cal. 1977)).  "[S]ubsections (a), (b), and (c) of section 2207, subdivision (2), operate in the alternative.  If any one of the three subsections applies, the variant terms of an acceptance do not become part of an agreement."  *Steiner v. Mobil Oil Corp.*, 20 Cal. 3d 90, at 103 (Cal. 1977).

124.  Applied to the circumstances of this case, the attorneys' fees/interest provisions may have been incorporated into the parties' Agreement, if EDC proves that: (1) Kazemi's purchase orders and November 20, 2014 email did not expressly limit acceptance to their terms; (2) Guillemot's invoice terms did not materially alter the parties' agreement; and, (3) ESE did not object to the interest or attorneys' fees provisions on Guillemot's invoices.  *See Steiner*, 20 Cal. 3d at 93–94.

//

### a. Express Limitation of Acceptance

125.   Based upon the evidence adduced at trial, the Court concludes that Kazemi failed to expressly limit acceptance to the terms of his November 20, 2014 email, or other prior oral negotiations with Guillemot.  Crane credibly testified that, while Kazemi had requested to take TX Wheels on consignment, Crane informed Kazemi that he was not authorized to enter into contracts for consignment with E.S.E. Additionally, as the Court found above, E.S.E. admits that its purchase orders did not expressly limit acceptance to their terms.  The Court concludes, by a preponderance of the evidence, that E.S.E. did not expressly limit acceptance to the terms of the November 20, 2014 email or any other, prior, oral negotiation between the parties.

### b. Material Change

126.  "A clause that would materially alter the contract is one which result[s] in surprise or hardship if incorporated without express awareness by the other party." *C9 Ventures v. SVC-W., L.P.*, 202 Cal. App. 4th 1483, 1506 (Cal. Ct. App. 2012) (internal quotation marks omitted).  "Examples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given are . . . a clause providing for interest on overdue invoices . . . where they are within the range of trade practice[.]"  *See* Cal. Com. Code § 2207, Off. Cmt. 5 (emphasis added); *cf.*, *S.W. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1252 (Cal. 1990) (affirming judgment that invoice term for late charges of 1.5% per month[12] became part of contract under § 2207 where invoices accompanied goods.); *Kawasho Internat., U.S.A. Inc. v. Lakewood Pipe Serv., Inc.*, 152 Cal. App. 3d 785, 792 (Cal. Ct. App. 1983) (affirming trial court's judgment that interest provision was incorporated into agreement under Section 2207); *O'Connor v. Televideo Sys., Inc.*, 218 Cal. App. 3d 709, 718–19 (Cal. Ct. App. 1990) ("The fact that the parties agreed to the 1 ½ percent monthly charge is

---

[12] Guillemot's invoices all provided for default interest of 1.5% per month.  (*See* Tr. Exs. 13, 15.)

also established by Commercial Code section 2207 which provides that additional terms become part of the contract between merchants unless the person receiving them objects."); *United States v. A.E. Lopez Enters., Ltd.,* 74 F.3d 972, 976 (9th Cir. 1996) (finding that interest terms on concrete supplier's invoice created an enforceable contract).

127.    California courts have also ruled that attorneys' fee provisions are terms that may bind a buyer if not objected to under § 2207. *Cf. Boyd v. Oscar Fisher Co.,* 210 Cal. App. 3d 368, 379 (Cal. Ct. App. 1989) (holding that where nothing in the parties' original agreement precluded a supplemental agreement on attorneys' fees, invoices added attorneys' fee provision under § 2207); *Progressive Produce Corp. v. Wild W. Produce, LLC,* No. CV 13-00665 RSWL, 2013 WL 1935921, at *3 (C.D. Cal. May 9, 2013) ("[T]he attorney's fee provision became a part of the Parties' contract pursuant to California Commercial Code § 2207(2) and created a contractual right to attorney's fees."); *South Bay Transp. Co. v. Gordon Sand Co.,* 206 Cal. App. 3d 650, 660 (Cal. Ct. App. 1988) (attorney fee provision added to carrier's contract by signed bills of lading); *Henry Avocado Corp. v. Polo's Produce, Inc.,* No. 1:10-CV-01298 AWI, 2010 WL 4569136, at *5 (E.D. Cal. Nov. 3, 2010) (finding "that neither the interest nor attorneys [sic] fees terms materially alter the contract"); *JC Produce, Inc. v. Paragon Steakhouse Rests., Inc.,* 70 F. Supp. 2d 1119, 1123 (E.D. Cal.1999) (holding that the plaintiff's invoices expressly reserved PACA trust rights over interest and reasonable attorney's fees); *but see C9 Ventures v. SVC-W., L.P.,* 202 Cal. App. 4th 1483, 1507 (Cal. Ct. App. 2012) ("Because the indemnification provision would have materially altered the terms of the oral contract between SVC and C9, the provision did not become part of their contract under section 2207."); *Food Team Int'l, Ltd. v. Unilink, LLC,* 872 F. Supp. 2d 405, 421–22 (E.D. Pa. 2012) (finding that attorneys' fees provision first included on invoice was material change to parties' agreement).

128.  Here, the Court concludes that, in accordance with California law, the interest and attorneys' fees provision at issue is not one that would "result in surprise or hardship if incorporated without express awareness by the other party."  The possibility of legal expenses and interest based upon a buyer's failure to pay a monetary obligation is not so unusual as to cause surprise to the buyer, E.S.E.  The concepts of legal action in pursuit of unpaid debts, as well as interest upon past-due amounts are common in business transactions and professional parlance.  And the provision at issue would not cause undue hardship to E.S.E. if incorporated without E.S.E.'s express awareness.  The interest rate is within the range of rates that have repeatedly been held to be insufficieint to constitute undue hardship.  And the attorneys' fees for which E.S.E. could be liable under that provision would also be within E.S.E.'s direct control (in theory, E.S.E. could pay its amounts-owing at any time to stem accrual of excessive legal fees).  For that reason, the Court holds that the additional interest and attorneys' fees provision on the Guillemot Invoices to E.S.E. does not constitute a material change to the contracting parties' agreement.

### c.  Notification of Objection

129.  "If no answer is received within a reasonable time after additional terms are proposed, it is both fair and commercially sound to assume that their inclusion has been assented to."  *See* Cal. Com. Code § 2207, Off. Cmt. 6.  "[I]n California, an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious."  *Lima v. Gateway, Inc.*, 886 F. Supp. 2d 1170, 1179 (C.D. Cal. 2012) (internal quotation marks omitted) (citing *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 32–35 (2d Cir. 2002); *Windsor Mills, Inc. v. Collins & Aikman Corp.,* 25 Cal. App. 3d 987, 992 (Cal. Ct. App. 1972)).

130.  However, "it is a general and well established principle of contract law that 'one who is ignorant of the language in which a document is written, or who is illiterate,' may be bound to a contract by negligently failing to learn its contents."

*Randas v. YMCA of Metro. L.A.*, 17 Cal. App. 4th 158, 163 (Cal. Ct. App. 1993) (citation omitted); *see also* Restatement (Second) of Contracts § 157 cmt. b (1981) ("Generally, one who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that he did not read them; his assent is deemed to cover unknown as well as known terms.").

140. As explained above, the Court finds that E.S.E. never objected to the interest or attorneys' fee provisions on anyinvoices it received from Guillemot. Ms. Urmaneta testified that E.S.E. did not respond because there was no need to respond because there was no dispute. The Court rejects Mr. Kazemi's testimony that he could not read the text on the invoice. E.S.E.'s failure to object to the interest and attorneys' fees provision stands in contrast to E.S.E.'s objection to the incorrect price term contained in the same Invoice.

141. As explained in greater detail above, the Court finds Kazemi's assertion that he could not (and cannot) read the Invoice terms to be not credible. Even assuming Kazemi could not read the terms, his failure to learn the contents of the interest and attorneys' fees provision does not permit E.S.E. to escape being bound by these terms. *See Randas*, 17 Cal. App. 4th at 163. Myra Urmeneta, Kazemi's personal assistant, credibly testified that E.S.E. did not object to the interest/attorneys' fees terms because "normally we don't really pay attention to that." Moreover, the Court received Myra Urmeneta's deposition testimony, (Urmeneta Dep. 193:24–194:4), as an admission by E.S.E.. Ms. Urmaneta testified that E.S.E. failed to object to the attorneys' fees/interest provision because·there was no reason to object as there·was no dispute at the time E.S.E. received the invoice. Alternatively, she testified that it slipped her mind. Accordingly, the Court concludes that EDC has met its burden of establishing, by a preponderance of the evidence, that E.S.E. failed to notify Guillemot of any objection to the interest and attorneys' fees provision on Trial Exhibits 13 and 15.

142.   Because (1) E.S.E. did not expressly limit acceptance to its terms, (2) the additional interest and attorneys' fees provision on the Guillemot Invoices did not materially change the contracting parties' agreement, and, (3) E.S.E. failed to object to the interest/attorneys' fees provision, the Court concludes that the interest/attorneys' fees provision was incorporated into the contracting parties' contract for sale of goods. Thus, E.S.E., as buyer, may be held "liable for all expenses incurred to recover the payment of [the invoiced] amount including all legal fees" and any past-due accounts are subject to 1.5% monthly interest.

### E.   Affirmative Defenses

143.   In its Answer, ESE raised a number of defenses to EDC's claims.  In its trial brief and at trial in this matter, ESE raised defenses only as to the 193 allegedly Defective Units.  (*See* DBR at 8–11.)  The Court discusses E.S.E.'s defenses in turn.

### 1.   Revocation of Acceptance

144.   Defendant claims that "[u]nder CA Commercial Code §2608, E.S.E. is not liable for the cost of the 193 Defective TX Wheels, since E.S.E.'s RMA requests for Defective TX Wheels was a revocation and rejection of the Defective TX Wheels." (DBR at 7.)  "[A] buyer may revoke acceptance [only] if: (1) there is a substantial nonconformity in the goods; (2) the nonconformity is difficult to discover; (3) the revocation occurs within a reasonable time; and (4) the revocation occurs 'before any substantial change in condition of goods which is not caused by their own defects." *Alco Stand. Corp. v. Beauwood California, Inc.*, 84-CV-4430, 1986 WL 8884, at *4 (C.D. Cal. Apr. 30, 1986) (citing Cal. Com. Code § 2608).

145.   As explained in Official Comment 2 to § 2607, "acceptance of goods precludes their subsequent rejection.  Any return of the goods thereafter must be by way of revocation of acceptance, under [§ 2608]." *Cf. Rawls v. Associated Materials, LLC*, 10-CV-01272, 2012 WL 3852875, *5 (S.D. W. Va. Sept. 5, 2012) ("[R]ejection of goods occurs, if at all, before acceptance of goods, and revocation of acceptance of goods occurs, if at all after acceptance of goods.").

146.  Importantly, "[a] buyer has the burden to prove that revocation of acceptance was . . . justified, including proof that the defects or nonconformity caused a substantial impairment in the value of the goods." *Zeta Consumer Prods. Corp. v. Equistar Chem. L.P*., 291 B.R. 336, 355 (Bankr. D.N.J. 2003); *Sherwin-Williams Co. v. Mark Charcoal Co.*, No. 80 C 4541, 1985 WL 3932, at *4 (N.D. Ill. Nov. 15, 1985) ("The party asserting revocation of acceptance has the burden of establishing that it was proper and justified, and that the seller's breach substantially impaired the value of the goods to the buyer."). "In 'cases between merchants . . . the essential content of the notice must set forth 'the nonconformity in the goods materially impairing their value to the buyer.' The content must also inform the seller that the buyer does not wish to keep the goods." *China Nat. Metal Prod. Imp./Exp. Co. v. Apex Digital, Inc.*, 141 F. Supp. 2d 1013, 1026 (C.D. Cal.), *order set aside on other grounds*, 155 F. Supp. 2d 1174 (C.D. Cal. 2001).

### a.  Substantial Nonconformity

147.  Here, E.S.E. has failed to discharge its burden of establishing that 193 units of TX Wheels were defective.  Mr. Kazemi testified that he does not know what defects, if any, exist in the 193 allegedly defective units in E.S.E.'s possession.  E.S.E. also admits it never notified Guillemot what defects, if any, exist in the 193 allegedly defective units in its possession.  Because E.S.E. has failed to establish that the 193 units at issue had a substantial nonconformity, E.S.E.'s revocation of acceptance defense fails with respect to the 193 allegedly defective units.

### b.  Revocation Within Reasonable Time

148.  Section 2608 also provides that, "[r]evocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it[.]" § 2608(2) (emphasis added); *cf. In re G. Paoletti, Inc*., 205 B.R. 251, 261 (Bankr. N.D. Cal. 1997) ("if acceptance is revoked, the buyer must return the goods to the seller.").  "A buyer who abandons the return process and keeps the goods therefore cannot recover the purchase price." *Genesis Health Clubs, Inc. v. LED*

*Solar & Light Co.*, 639 F. App'x. 550, 556 (10th Cir. 2016) (finding buyer "did not effectively reject or revoke acceptance of the lights because it never relinquished dominion over them."); *Barry & Sewall Indus. Supply Co. v. Metal–Prep of Houston, Inc.,*912 F.2d 252, 257 (8th Cir. 1990) (buyer must unequivocally and timely revoke and "not indulge in any action which would indicate that he has reaccepted the goods"); *White v. Holiday Kamper & Boats*, 06-CV-2362, 2008 WL 4155663, at *3 (D.S.C. Sept. 9, 2008) ("Revocation of acceptance . . . requires return of goods[.]") (citation omitted); *Sherwin-Williams*, 1985 WL 3932, at *4 ("a buyer may lose his right to revoke acceptance before or after its attempted revocation by the exercise of ownership over the goods.") (*citing*, 4 Anderson, Uniform Commercial Code, § 2:608–43–44 at 204 (3d Ed. 1983)); *C.A.I., Inc. v. Vitex Packaging Group, Inc.*, 115 F. Supp. 3d 168, 174, n. 2 (D. Mass. 2015) ("Vitex has cited no provision of the Uniform Commercial Code that both permits revocation of acceptance by a merchant-buyer . . . *and* permits the merchant-buyer to retain the good for ongoing future use by refusing to return it without any payment whatsoever.").

149.   In addition to its failure to prove a substantial nonconformity in the 193 allegedly defective units, E.S.E.'s revocation defense also fails because the evidence before the Court shows that E.S.E. abandoned the return process and retains possession of the allegedly defective units to this day.  Although E.S.E. argued that Guillemot refused to issue RMAs, the documentary evidence before the Court shows that Guillemot repeatedly emailed E.S.E. and offered RMAs, but E.S.E. failed to respond in writing to those emails.  Mr. Chammas testified that he sent repeated emails to E.S.E. regarding the RMAs, but received no response.  (*See, e.g.,* Tr. Ex. 87.)  Myra Urmeneta testified that, after receiving Guillemot's emails regarding Guillemot's desire to issue an RMA for all remaining inventory, (Tr. Ex. 10), she discussed the emails with Kazemi, who stated that he would speak to Tanner, such that Urmeneta did not need to reply to the email.  Contrary to E.S.E.'s claim that Guillemot refused to provide RMAs, the Court concludes that E.S.E.'s failure to

(1) respond to Guillemot's emails concerning the RMA process, and, (2) clarify that E.S.E. was seeking an RMA for defective units only, rather than all units, caused the return process to falter. Moreover, E.S.E. has retained possession over the 193 allegedly defective units to this day. For these reasons, the Court concludes that E.S.E. failed to effectively revoke its acceptance of the 193 allegedly defective units.

### 2. Adequate Assurances/Cooperation

150. Defendant also asserts that it was entitled to "delay and suspend performance of payment to Guillemot, and did not breach the agreement between Guillemot and EDC for the TX Wheels, pending adjudication of the parties [sic] rights, in light of Guillemot's refusal and failure to honor E.S.E.'s RMA requests for Defective TX Wheels." (DBR at 8.) Defendant invokes California Commercial Code §§ 2609 and 2311.[13]

151. Like E.S.E.'s revocation of acceptance defense, E.S.E.'s adequate assurances/cooperation defense fails in light of the evidence presented at trial. The evidence before the Court shows that Guillemot repeatedly contacted E.S.E. between July 30, 2015 and October 22, 2015, (*see* Tr. Exs. 10, 11, 86, 87), and even prepared an RMA, (Tr. Ex. 69), though Guillemot ultimately did not send the RMA to E.S.E. E.S.E. failed to respond to Guillemot's emails, or communicate in any way, regarding the RMA and return process. E.S.E.'s also failed to clarify its insecurity allegedly caused by Guillemot's request that E.S.E. return all the TX Wheels in its possession. For these reasons, the Court concludes that E.S.E.'s adequate assurances defense is meritless.

---

[13] Defendant appears to contend that the parties' agreement lacked specifications regarding the RMA return process, and thus, Defendant was entitled to make a good faith specification regarding return. And according to Defendant, Guillemot's cooperation was necessary for Defendant to effect the return. On that basis, Defendant claims it was entitled to delay and suspend performance of payment to Guillemot "pending adjudication of the parties [sic] rights."

### 3. Unclean Hands

152. The unclean hands defense arises from the maxim, "[h]e who comes into equity must come with clean hands." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 241 (1933). "[T]he Supreme Court explained that unclean hands applies only where the 'unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.'" *Gilead Scis., Inc. v. Merck & Co, Inc.*, No. 13-CV-04057-BLF, 2016 WL 3143943, at *24 (N.D. Cal. June 6, 2016) (citing *Keystone Driller*, 290 U.S. at 245). "The misconduct must 'affect the equitable relations between the parties in respect of something brought before the court for adjudication.'" *Id.* (quoting *Keystone Driller*, 290 U.S. at 245.)

153. "To establish unclean hands, a defendant must demonstrate (1) inequitable conduct by the plaintiff; (2) that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant; and[,] (3) plaintiff's conduct injured the defendant." *Metro-Goldwyn-Mayer Studios*, 518 F. Supp. 2d at 1222–23 (quoting *Survivor Prods. LLC v. Fox Broadcasting Co.,* 2001 WL 35829270, at *3 (C.D. Cal. June 12, 2001)) (citing *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 847 (9th Cir. 1987) ("[T]he defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims.")).

154. Additionally, the unclean hands "defense will not apply if the defendant merely establishes harm to the public interest." *McCormick v. Cohn,* 1992 WL 687291, at *4 (S.D. Cal. July 31, 1992); *see also Broderbund,* 648 F. Supp. at 1138 (N.D. Cal. 1986) ("[A] defense of unclean hands may be asserted in a copyright infringement action only where the defendant can show that he has personally been injured by the plaintiff's conduct.") (citing *Mitchell Brothers Film Group v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir. 1979)).

155. Notably, unclean hands, "does not stand as a defense that may be properly considered independent of the merits of the plaintiff's claim—such as the defenses of

the statute of limitations or the statute of frauds." *Republic Molding Corp. v. B. W. Photo Utilities*, 319 F.2d 347, 350 (9th Cir. 1963).  Irrespective of the defense, the Court must ascertain the soundness of the plaintiff's claim.  *Id.*  This means that,

> the court should not automatically condone the defendant's infractions because the plaintiff is also blameworthy, thereby leaving two wrongs unremedied and increasing the injury to the public. Rather the court must weigh the substance of the right asserted by plaintiff against the transgression which, it is contended, serves to foreclose that right. The relative extent of each party's wrong upon the other and upon the public should be taken into account, and an equitable balance struck.

*Id.* (citing *Alfred Bell & Co., Ltd. v. Catalda Fine Arts*, 191 F.2d 99, 106(2nd Cir. 1951); *Stein v. Mazer*, 204 F.2d 472, 480 (4th Cir. 1953)).  Furthermore, "[t]he doctrine of unclean hands does not deny relief to a plaintiff guilty of any past misconduct; only misconduct directly related to the matter in which he seeks relief triggers the defense."  *Cal-Agrex, Inc. v. Tassell*, 258 F.R.D. 340, 351 (N.D. Cal. 2009), *aff'd*, 408 F. App'x 58 (9th Cir. 2011)(citing *Kendall–Jackson Winery, Ltd. v. Super. Ct.,* 76 Cal. App. 4th 970, 974 (Cal. Ct. App. 2000)).

157.  E.S.E. asserts that EDC is not entitled to the contract value of the TX Wheels as a result of assignor Guillemot's unclean hands.  Defendants' Fourth Affirmative Defense states in relevant part that, "Plaintiff herein, and each and every cause of action contained in the First Amended Complaint, is barred by reason of acts, omissions, representations, and courses of conduct by non-party Guillemot . . . ." (Answer at 10.)  And in its trial brief, Defendant explains that,

> Guillemot's refusal to honor E.S.E.'s RMA requests for Defective TX Wheels, as well as Guillemot's conduct in demanding full payment or return of all of the TX Wheels in early 2015, without legal grounds, and Guillemot's disruption of E.S.E.'s business relationship with Wintec, support E.S.E.'s Second Affirmative Defense for Estoppel and Unclean Hands[.]

158.  Defendant failed to adduce sufficient evidence to prove its unclean hands defense.  Except for Kazemi's own testimony, Defendant failed to offer any documentary evidence or testimony to support this defense.  And even Kazemi's testimony demonstrates that Kazemi can only speculate that Tanner's call to Wintec

36.

precipitated the termination of Wintec and E.S.E.'s business relationship. Kazemi testified at trial that Ray Huang, of Wintec, never actually told Kazemi that Wintec stopped buying form E.S.E. because of Guillemot. Furthermore, Tanner credibly testified that he contacted Wintec to ascertain the source of Wintec's TX Wheels. In light of the entirety of the evidence, the Court concludes that Defendnat has failed to establish any inequitable conduct by Guillemot.

159. Defendant also failed to meet its burden with respect to demonstrating that any alleged wrongdoing on Guillemot's part was directly related to the claims EDC now brings as Guillemot's assignee. In fact, Kazemi himself agreed with EDC's counsel's question at trial that whether Guillemot interfered in E.S.E.'s relationship with Wintec has nothing to do with E.S.E.'s obligation to pay for the TX Wheels E.S.E. resold. Kazemi also testified that he did not express to Guillemot that E.S.E. would not pay Guillemot due to Guillemot interfering with E.S.E. and Wintec's relationship. And E.S.E. offered no evidence (beyond Kazemi's self-interested testimony) that E.S.E. suffered any damages as a result of Guillemot's alleged wrongdoing. The Court rejects Mr. Kazemi's testimony on this point as not credible. In sum, the Court concludes that Defendant has failed to prove the merits of its unclean hands defense.

### 4. Estoppel

160. Four elements are essential to raise an equitable estoppel defense: (1) the party to be estopped must be apprised of the facts; (2) it must intend that its conduct be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and (4) the party asserting the estoppel must rely upon the conduct to its injury. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1225 (C.D. Cal. 2007) (citing *Hampton v. Paramount Pictures Corp.,* 279 F.2d 100, 105 (9th Cir. 1960)); *see also Granco Steel, Inc. v. Workmen's Comp. Appeal Bd.*, 68 Cal. 2d 191, 203, (Cal. 1968).

Defendant contends that,

> Guillemot's refusal to honor E.S.E.'s RMA requests for Defective TX Wheels, as well as Guillemot's conduct in demanding full payment or return of all of the TX Wheels in early 2015, without legal grounds, and Guillemot's disruption of E.S.E.'s business relationship with Wintec, support E.S.E.'s Second Affirmative Defense for Estoppel and Unclean Hands, Third Affirmative Defense for Waiver, and Fourth Affirmative Defense for Estoppel with respect to attorneys fees and interest that EDC seeks.

(DBR at 9.)

161.   As explained above, the Court concludes that E.S.E.'s own failure to communicate with respect to the RMA precipitated the breakdown of the return process.  And Defendant has not met its burden with respect to its unclean hands defense.  In view of the totality of the evidence, the Court finds no bad faith on Guillemot's part.  Accordingly, E.S.E. has failed to prove any of its purported bases for its estoppel defense.  Thus, Defendant's estoppel defense fails.

### 5.   Waiver

163.   "Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it."  *Metro-Goldwyn-Mayer Studios.*, 518 F. Supp. 2d at 1224 (citing *United States v. King Features Entm't, Inc.,* 843 F.2d 394, 399 (9th Cir. 1988)).  Defendants' Third Affirmative Defense states in relevant part that:

> by reason of conduct by non-party Guillemot which constitutes a waiver of Plaintiff's rights, these answering Defendants are excused from the performance of the obligation alleged in the First Amended Complaint, since Plaintiff's claims against Defendants in the First Amended Complaint are brought by Plaintiff on behalf of Guillemot, as Guillemot's assignee.

(Answer at 9.)  Defendant also explains that "Guillemot's refusal to honor E.S.E.'s RMA requests for Defective TX Wheels, as well as Guillemot's conduct in demanding full payment or return of all of the TX Wheels in early 2015, . . . and

Guillemot's disruption of E.S.E.'s business relationship with Wintec, support E.S.E.'s . . . Third Affirmative Defense for Waiver . . . ." (DBR at 9.)

164.   Like Defendant's estoppel defense, the waiver defense is similarly misplaced and meritless.  Little to no evidence supports Defendant's theory of Plaintiff's waiver of rights in this case.  Furthermore, the evidence demonstrates that Guillemot repeatedly demanded that E.S.E. return all units, demanded payment for all units, and offered an RMA for all units.  Guillemot's actions do not demonstrate any intentional relinquishment of rights associated with the TX Wheels transaction.  Accordingly, the Court concludes that Defendant fails to meet its burden of establishing this defense.

### 6.     Failure to Mitigate

165.   "California law is clear that a 'plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided.'"  *Cent. Coast Pipe Lining, Inc. v. Pipe Shield USA, Inc.*, No. 2:13-CV-00639-ODW, 2013 WL 6442603, at *7 (C.D. Cal. Dec. 9, 2013) (quoting *Shaffer v. Debbas,* 17 Cal.App.4th 33, 41 (Cal. Ct. App. 1993)); *see also Ins. Co. of the State of Pennsylvania v. Citizens of Humanity LLC*, No. SA-CV-13-01564-JVS-DFMX, 2014 WL 12689271, at *5 (C.D. Cal. Feb. 24, 2014).

166.   Defendant's Fifth Affirmative Defense reads in relevant part, "by reason of non-party Guillemot's failure to mitigate its damages, Plaintiff has assumed comparative fault through non-party Guillemot's failure to fully perform its obligations to Defendants, since Plaintiff's claims against Defendants in the First Amended Complaint are brought by Plaintiff on behalf of Guillemot, as Guillemot's assignee." (Answer at 10.)

167.   Defendant adduced no evidence at trial relating to Defendant's failure to mitigate defense.  And Defendant fails to address this defense in its trial brief. (*See*

DBR.)  Accordingly, the Court concludes that Defendant has failed to meet its burden to establish the failure to mitigate defense.

### F.    Plaintiff's Claims for Restitution and Constructive Trust

168.    In light of the foregoing discussion, the Court concludes that it need not exercise its equity jurisdiction over Plaintiff's claims for restitution and constructive trust.  "This conclusion follows from the general principle of equity that equitable relief (such as restitution) will not be given when the plaintiff's remedies at law are adequate."  *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 260 (Cal. Ct. App. 2011), *as modified* (Dec. 28, 2011) (citing *Ramona Manor Convalescent Hospital v. Care Enterprises*, 177 Cal. App. 3d 1120, 1140 (Cal. Ct. App. 1986); 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 1040–1041, pp. 1130–32; *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007)); *see also Mort v. United States*, 86 F.3d 890, 892 (9th Cir. 1996) (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381 (1992)) ("It is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law. . . .").

### G.    Conversion/Punitive Damages

169.    EDC did not plead a conversion/negligence claim in its FAC.  (*See* Dkt. No. 18.)  Accordingly, the Court need not address Plaintiff's arguments pertaining to conversion or punitive damages.

### IV.

### CONCLUSION

The Court concludes that EDC has shown, by a preponderance of the evidence, that: (1) Guillemot and E.S.E. intended to form a contract for sale; (2) the additional attorneys' fees and interest provision were incorporated into the underlying agreement; and, (3) EDC is entitled to judgment with respect to its action for the price claim.  The Court further concludes that E.S.E. has failed to meet its burden of

1  establishing any of its affirmative defenses.

2       Because EDC has met its burden of proving all applicable elements and E.S.E.

3  failed to prove its affirmative defenses, the Court hereby holds that, in addition to the

4  contract value of 926 units non-defective TX Wheels, (*see* MSJ2 Order at 38), EDC is

5  also entitled to recover from Defendant E.S.E.: (1) the contract value of the 193

6  allegedly defective TX Wheels units ; (2) one and a half percent (1.5 %) monthly

7  interest on the contract value of 1,119 TX Wheels units, from the payment due date of

8  January 24, 2015 through the date of judgment; (3) attorneys' fees as provided for

9  under the contracting parties' agreement.

10      JUDGMENT is for Plaintiff Export Development Canada in the amount of

11  $226,586.31 plus the interest described above and attorneys' fees.  Plaintiff is hereby

12  ORDERED to file a Proposed Judgment by September 18, 2017 by 4 :00 p.m.

13

14      IT IS SO ORDERED.
15  DATED: September 5, 2017

16                              By: _____

17                                  Honorable Beverly R. O'Connell
18                                  United States District Court Judge

19

20

21

22

23

24

25

26

27

28